JRS/TJT:PJC
F. #2021R00440

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

INWOO KIM,
      also known as "Tony Kim" and
      "Long Jin," and
DANIEL LEE,
      also known as "Daniel Yang" and
      "Donghee Yang,"

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANTS

No. 26-MJ-28

(T. 18, U.S.C., § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

JILLIAN HUSMAN, being duly sworn, deposes and states that she is a Special

Agent with the U.S. Department of Health and Human Services, Office of Inspector General

("HHS-OIG"), duly appointed according to law and acting as such.

In or about and between March 2016 and January 2026, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants

INWOO KIM, also known as "Tony Kim" and "Long Jin," and DANIEL LEE, also known as

"Daniel Yang" and "Donghee Yang," together with others, did knowingly and willfully conspire

to execute a scheme and artifice to defraud one or more health care benefit programs, as that term

is defined under Title 18, United States Code, Section 24(b), to wit: Medicare, Medicare

Advantage, Medicaid and Medicaid Managed Care plans, and to obtain, by means of one or more

materially false and fraudulent pretenses, representations and promises, money and property

1

owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been a Special Agent with HHS-OIG for approximately seven years. As an HHS-OIG Special Agent, I investigate health care fraud, including schemes to defraud federal health care benefit programs and schemes involving illegal kickbacks and bribes. During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, arranged consensually monitored telephone calls and video recordings, executed search warrants and reviewed health care claims data, bank records, telephone records, medical records, invoices and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of federal health care benefit programs.

2. I have personally participated in the investigation of the offense discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, and (c) information obtained from witnesses and records.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of establishing probable cause in

2

support of a complaint and for the issuance of arrest warrants, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts, in sum and substance and in part, which I believe are necessary to establish probable cause in support of a complaint and for the issuance of the arrest warrants.

## **PROBABLE CAUSE**

At all times relevant to this Application:

### I. The Defendants and Relevant Entities and Individuals

4. The defendant INWOO KIM, also known as "Tony Kim" and "Long Jin," is the beneficial owner of Happy Life Inc. ("Happy Life") and Z & W Empire Enterprise, Inc., doing business as Royal Adult Day Care Center ("Royal").

5. The defendant DANIEL LEE, also known as "Daniel Yang" and "Donghee Yang," is the program director of Happy Life and was the program director of Royal.

6. Happy Life is a social adult day care ("SADC") in Flushing, New York.

7. Royal was a social adult day care ("SADC") located in Flushing, New York. It previously operated under the name Royal before it closed and was rebranded as another location for Happy Life.

8. Pharmacy-1, an entity the identity of which is known to me, is a retail pharmacy located in Flushing, New York that KIM previously owned.

9. Co-Conspirator-1, an individual whose identity is known to me, was a Happy Life employee.[1]

---

[1] Co-Conspirator-1 has been charged with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. He/she has provided information to the government in the hopes for a favorable outcome in his/her case, including a potential cooperation agreement. Information Co-Conspirator-1 has provided has proven reliable and been corroborated by other evidence.

10. Cooperating Witness-1, an individual whose identity is known to me, is KIM and LEE's associate and the owner of Pharmacy-1.[2]

11. Individual-1, an individual whose identity is known to me, is Cooperating Witness-1's employee.

12. Individual-2, an individual whose identity is known to me, was a Happy Life employee.

13. MLTC-1, an entity the identity of which is known to me, is a Medicaid managed long term care ("MLTC") plan with which Happy Life and Royal contracted in order to provide SADC services to MLTC-1's members.

II. Background

A. Medicare and Medicaid

14. Medicare was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

15. Medicare was divided into multiple parts. Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. Medicare Part B covered outpatient hospital services and professional services provided by physicians and other providers. Medicare Part C—also known as Medicare Advantage—offered

---

[2] Cooperating Witness-1 has pleaded guilty to a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, in connection with another investigation and is cooperating in the hopes for leniency in his/her own case. Information provided by Cooperating Witness-1 has proven reliable and been corroborated by other evidence.

4

beneficiaries the opportunity to secure coverage from private insurers for many of the same services that were provided under Parts A and B, in addition to certain mandatory and optional supplemental benefits, including prescription drug coverage and over-the-counter ("OTC") allowances. Medicare Part D provided prescription drug coverage to persons who were eligible for Medicare.

16. Medicaid was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing Medicaid in participating states, including New York State. Individuals who received benefits under Medicaid were referred to as "recipients."

17. Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. In New York State, Medicaid provided coverage to its recipients for prescription drugs. Medicaid recipients could obtain their prescription drug benefits from pharmacies either through "fee-for-service" enrollment or through Medicaid Managed Care plans, which were administered by private insurance companies that were paid by Medicaid.

18. Medicare, Medicare Advantage, Medicaid and Medicaid Managed Care plans (collectively the "Plans") were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b), and referenced in Title 18, United States Code, Section 1347, and were "Federal health care programs," as defined in Title 42, United States Code, Section 1320a-7b(f).

19. Medicaid in New York State ("New York Medicaid") was administered by the New York State Department of Health (the "New York DOH"). The New York DOH approved certain MLTC plans to provide managed care to New York Medicaid recipients with

long-lasting health issues or disabilities. Each MLTC plan had its own network of health care providers. New York Medicaid managed care providers who were within an MLTC network did not bill Medicaid directly, but instead billed the MLTC plan for services provided to their recipients.

20. New York Medicaid MLTC services included social adult day care services. The term "social adult day care" described a structured program that provided older adults with functional impairments socialization, supervision, personal care and nutrition services in a protective setting. An SADC center would, for example, provide a space where its members could congregate and socialize by talking, playing card or board games, listen to music, sing karaoke or participate in other activities under the supervision of SADC center staff who were trained to provide assistance to people with mobility and other health issues. Healthy meals, as well as transportation to and from the day care center, may also be provided.

21. CMS assigned pharmacies and SADCs a national provider identifier ("NPI"). A pharmacy dispensing medications to a beneficiary used its assigned NPI when submitting a claim for reimbursement under Medicare Part D. A pharmacy was permitted to submit claims for reimbursement under Medicare Part D only for medications actually dispensed and was required to maintain records verifying that it dispensed the medications.

22. Medical providers were required to enroll with Medicare, Medicaid and/or the MLTC plans in order to submit claims for reimbursement to the MLTCs and the Plans. Claims were typically submitted electronically and identified the service or good provided to the patient. The Plans and the MLTCs paid for claims only if the items or services were medically reasonable, medically necessary, documented, provided as represented and not induced by illegal kickbacks and bribes.

6

B.      Pharmacy Claims Processing

23.      A pharmacy could participate in the Medicare Part D program by entering into a retail network agreement: (a) directly with a Part D Plan, (b) with one or more Pharmacy Benefit Managers ("PBMs"), or (c) with a Pharmacy Services Administration Organization ("PSAO"). A PBM acted on behalf of one or more Part D Plans. Through a Part D Plan's PBM, a pharmacy could join a Part D Plan network. A PSAO contracted with PBMs on behalf of the pharmacy.

24.      Typically, a Medicare beneficiary enrolled in a Part D Plan obtained prescription medications from a pharmacy authorized by the beneficiary's Part D Plan. After filling a beneficiary's prescription, the authorized pharmacy submitted the claim either directly to a Part D Plan or to a PBM that represented the Part D Plan. The pharmacy provided the beneficiary's identification number as well as the pharmacy's NPI with the claim. The Part D Plan or the PBM determined whether the pharmacy was entitled to payment for each claim. Then, the Part D Plan or PBM, either directly or through a PSAO, reimbursed the pharmacy for the claim.

25.      As part of their insurance benefits, some Medicare beneficiaries and Medicaid recipients received a certain amount of credit per month that could be spent on eligible OTC non-prescription items such as analgesics, vitamins, durable medical equipment and other products. OTC money could not be spent on unapproved items. The monthly OTC credit was pre-loaded onto debit cards known as "over-the-counter cards" or "OTC Cards," which were issued to beneficiaries and recipients. Any funds that were not used by the end of the month were forfeited, and the OTC Cards were reloaded each month with refreshed funds. Pharmacies generally dispensed OTC products to Medicare beneficiaries and Medicaid recipients by swiping

7

the OTC Cards through an electronic payment system that debited the cost of approved OTC products.

III. The Health Care Fraud and Kickback Scheme

26. In or about and between March 2016 and January 2026, INWOO KIM and DANIEL LEE, together with others, conspired to (a) submit and cause the submission of fraudulent patient encounters to the Plans for the dispensing of pharmaceutical and OTC products at Pharmacy-1 that were medically unreasonable and unnecessary, not actually provided and procured by the payment of kickbacks and bribes to Medicare beneficiaries and Medicaid recipients, (b) submit and cause the submission of fraudulent claims to Medicaid through the MLTCs for SADC services that were not provided and/or were induced by the payment of illegal kickbacks and bribes, (c) pay illegal kickbacks and bribes to Medicaid recipients to induce them to enroll in SADC services at Royal and Happy Life and (d) pay illegal kickbacks and bribes to Medicare beneficiaries and Medicaid recipients to induce them to fill prescriptions at Pharmacy-1.

27. In or about 2021, HHS-OIG began investigating KIM and his associates for the payment of illegal kickbacks and bribes at KIM's SADCs and pharmacies. As part of the investigation, law enforcement obtained documents from MLTC-1 related to Happy Life and Royal's provision of SADC services to MLTC-1's members. Among those documents were copies of LEE's resume, which listed him as Royal's program director since approximately March 2018 and as Happy Life's program director since approximately September 2023. LEE's resumes indicate that he is responsible for billing MLTCs.

28. Also included in the documents were contracts between MLTC-1 and Happy Life for the provision of SADC services that KIM signed and correspondence from KIM denying that his SADCs paid kickbacks and bribes.

A. Claims Data

29. Medicaid claims data for Royal and Happy Life shows that, between approximately 2016 and 2026, Medicaid paid Royal and Happy Life approximately $62 million for purportedly providing SADC services.

30. Medicare claims data for Pharmacy-1 shows that, between approximately 2016 and 2023, Pharmacy-1 was paid approximately $58 million for prescription drugs that, based on the information described below, were medically unnecessary and/or induced by the payment of illegal kickbacks and bribes.

B. Complaints Related to Kickbacks and Bribes at Happy Life

31. Happy Life has been the subject of at least two complaints to MLTC-1. In approximately March 2023, MLTC-1 received an anonymous complaint regarding Happy Life and two other SADCs. The complaint indicated that Happy Life "use[s] kickbacks to give cash to senior membrs [sic] to solicit customers everywhere." In response to the allegation, Happy Life submitted two letters denying that it offers financial incentives to members. MLTC-1 was unable to substantiate the allegation, as interviewed managers denied paying incentives and provided attendance logs for certain members.

32. In approximately October 2023, KIM sent a letter to MLTC-1 in response to an inquiry related to the payment of kickbacks and bribes. In the letter, KIM wrote: "We do not offer any kind of incentive and will not accept any members that primarily come into day care centers for compensations [sic] only."

9

33.     In approximately March 2024, MLTC-1 received an email complaint alleging "potentially fraudulent activities conducted by several social adult day care centers that all operate within the neighborhood of Flushing, Queens."  The complainant learned of the conduct through his/her father and reported that Happy Life "offered five hundred dollars ($500) for [members] non-attendance to the center entirely, and three hundred dollars ($300) if [members] wanted to attend."  According to the complainant, Happy Life additionally presented members "the option to receive cash payments instead of receiving actual homecare services by a homecare agent deployed by the daycare center."  The complainant further relayed that, "on the days that [members] did attend, the daycare centers had limited offerings and did not fulfill the services stated within their contracts and insurance plans.   They were merely allowed to use the facilities and its amenities."  According to the complainant, "[m]embers across these day care centers are subject to sign numerous attendance records ahead of time."   Happy Life again submitted a letter to MLTC-1 denying paying any incentives to its members, which had no signature but listed LEE's name in the signature block.   The letter stated, "we do not offer any sorts of kickback or financial incentives for our seniors" and provided a phone number that subscriber records indicate is registered to LEE.

B.     Impossible Service Dates at Happy Life

34.     A comparison of Medicaid claims data for dates of service purportedly provided by Happy Life and dates of service when the same Medicaid recipient was receiving in-patient service at a hospital or other care facility shows more than two dozen instances of impossible claims submitted for SADC services that could not have been provided since the Medicaid recipient was hospitalized.   Examples of these claims for approximately 20 SADC dates of service are listed below:

10

| Medicaid Recipient | Happy Life Dates of Service | Inpatient Dates of Service |
|---|---|---|
| X.J. | 2/28/2023 and 3/1/2023 | 2/26/2023 – 3/2/2023 |
| S.K. | 5/1/2023 | 4/30/2023 – 5/15/2023 |
| Y.K. | 5/23/2023 | 5/22/2023 – 5/27/2023 |
| H.C. | 1/2/2024 | 12/30/2024 – 1/3/2024 |
| H.O. | 1/12/2024, 1/15/2024 and 1/17/2024 | 1/10/2024 – 1/18/2024 |
| Y.K. | 3/11/2024 and 3/18/2024 | 3/1/2024 – 3/31/2024 |
| K.Y.* | 1/20/2025, 1/21/2025, 1/23/2025 and 1/24/2025 | 1/19/2025 – 1/25/2025 |
| J.H.* | 4/17/2025 and 4/18/2025 | 4/16/2025 – 4/24/2025 |
| Y.Y.* | 5/6/2025, 5/7/2025, 5/8/2025 and 5/9/2025 | 5/5/2025 – 5/10/2025 |

35.    Those entries listed above with an asterisk included claims for transportation to/from the SADC center, which also could not have been provided since the Medicaid recipient was hospitalized and therefore not attending Happy Life.

C.    The OSC Site Visit to Royal and OSC's Analysis

36.    In approximately February 2024, New York State Office of State Comptroller ("OSC") conducted a site visit at Royal.  As part of the site visit, Royal's staff provided sign-in sheets tracking member attendance and transportation.  The sign-in sheets had numerous suspicious elements, including instances where members signed too many times and their signature was whited out or scribbled over, sign-in sheets that had pre-filled dates listed but were blank, sign-in sheets that were completely signed but had no dates of service, and sign-in sheets with a highlighted date, as if to flag for the member that they missed a signature.  Some of the accompanying member files appear to have been filled out by LEE, as they list his/her first name as the staff member who completed the form.  Sample member files also appear to be photocopied duplicates of one another with several fields filled in exactly the same.

37.     During the approximately February 2024 site visit, OSC interviewed LEE. OSC was unable to view more than one week's worth of sign-in sheets and was unable to view January or February 2024 daily sign-in sheets because, according to LEE, the cleaning lady likely threw them out or they were in his car or residence.   For the sign-in sheets OSC was able to review, which did not include the day OSC was present on site even though there were members present, it appeared that the handwriting for numerous names in a row was all in the same handwriting.   Documents appearing to have the same handwriting were provided to OSC by LEE. OSC also observed patterns of pre-filled dates on signature pages.   OSC was also provided sign-in sheets for services purportedly provided on a Sunday when Royal is closed, and it was shown sign-in sheets for the same member that were stapled together for consecutive months, which suggests the sign-in sheets were potentially presented to the member all at once for signature.

38.     OSC's analysis of Royal's claims data also showed several impossible days based on the number of Medicaid recipients billed for a single day.   On dozens of days, Royal billed for hundreds, and sometimes over 1,000, individual Medicaid recipients who purportedly received services that day.   For example, on approximately August 8, 2022, Royal purported to provide SADC services to approximately 1,041 Medicaid recipients, on approximately January 9, 2023, Royal purported to provide SADC services to approximately 823 Medicaid recipients, on approximately February 27, 2023, Royal purported to provide SADC services to approximately 784 Medicaid recipients, and on approximately March 27, 2023, Royal purported to provide SADC services to approximately 790 Medicaid recipients.   Notably, Royal's billing location at this time had a certificate of New York City Department of Building certificate of occupancy that permitted only 81 people in the premises, including staff.

39. OSC's analysis of Happy Life's claims data shows similar patterns with several days during the relevant period in which Happy Life billed for services purportedly provided to hundreds of Medicaid recipients, well beyond the capacity of its location.

D.     Cooperating Witness-1

40. Cooperating Witness-1 owned Pharmacy-1 with KIM and has exchanged emails with KIM related to the payment of kickbacks and bribes to Pharmacy-1 customers, including by providing cash for their monthly OTC benefit balance, in exchange for them filling profitable prescriptions at Pharmacy-1. For example, in approximately April 2022, Cooperating Witness-1 emailed KIM a spreadsheet that tracked kickbacks and bribes, denoted in the spreadsheet as "CP" for "coupon," by month and also by drug, specifically referring to kickbacks of up to approximately $100 for Diclofenac Epolamine, an expensive and profitable pain patch:

| Member ID | Jan Prof | Feb Prof | Prof Tota | Jan CP | Feb CP | CP To | Net Profit Ja | Net Profit Feb | Total Net |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 447.65 | 447.65 | - | 35 | 35 | - | 412.65 | 413 |
| 138.86 | 1338.11 | 1476.97 | 22 | 267 | 289 | 117 | 1071.11 | 1,188 |
| 1316.24 | 758.35 | 2074.59 | 128 | 70 | 198 | 1,188 | 688.35 | 1,877 |
| 992.51 | 874.21 | 1866.72 | 85 | 73 | 158 | 908 | 801.21 | 1,709 |
| 1167.51 | 962.39 | 2129.9 | 173 | 150 | 323 | 995 | 812.39 | 1,807 |
| 25.7 | 0 | 25.7 | 3 | 0 | | 23 | 0 | 23 |
| 764.74 | 592.2 | 1356.94 | 77 | 79 | 156 | 688 | 513.2 | 1,201 |
| 996.14 | 1140.15 | 2136.29 | 146 | 143 | 289 | 850 | 997.15 | 1,847 |
| 525.67 | 743.18 | 1268.85 | 100 | 135 | 235 | 426 | 608.18 | 1,034 |
| 269.89 | 398.62 | 668.51 | 46 | 58 | 104 | 224 | 340.62 | 565 |
| 218.52 | 347.06 | 565.58 | 27 | 30 | 57 | 192 | 317.06 | 509 |
| 525.67 | 804.77 | 1330.44 | 100 | 124 | 224 | 426 | 680.77 | 1,106 |
| 1190.44 | 825.48 | 2015.92 | 191 | 179 | 370 | 999 | 646.48 | 1,646 |
| 730.7 | 689.22 | 1419.92 | 149 | 144 | 293 | 582 | 545.22 | 1,127 |
| 6.94 | 794.35 | 801.29 | 6 | 114 | 120 | 1 | 680.35 | 681 |

| DRUGNAME | QUANT | DRGTYPE | INSNAME | RXNO | TOTALPROFIT | CP |
|---|---|---|---|---|---|---|
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 346923 | 525.67 | $50.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 367659 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 351780 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 353827 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 362582 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 363143 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 368219 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 359367 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 345369 | 525.67 | $100.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | INGENIO | 362134 | 150.91 | $20.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 356640 | 525.67 | $50.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 363009 | 525.67 | $50.00 |
| DICLOFENAC EPOLAMINE ** 1.3 % PATCH (00093-3727-55) | 60 | P | OPTUM RX | 366810 | 525.67 | $100.00 |

41.     Cooperating Witness-1 also reported to law enforcement that he/she witnessed LEE paying kickbacks and bribes in Royal.  In approximately the summer of 2022, Cooperating Witness-1, at KIM's direction, spent approximately several weeks at Royal paying kickbacks to patients for prescriptions filled at Pharmacy-1.  While at Royal, Cooperating Witness-1 saw Royal members line up outside of LEE's office to receive payment from LEE.  Cooperating Witness-1 understood from his/her time in Royal that LEE was KIM's business partner at Royal.

E.     Text Messages

42.     KIM and LEE texted with Co-Conspirator-1 about illegal kickbacks and bribes.  For example, on approximately February 3, 2023, Co-Conspirator-1 texted KIM in Korean, "You're giving it out on Monday, right?  I told the elders to come Monday."  Co-Conspirator-1 has confirmed to law enforcement that this message related to paying cash to Happy Life's members.

43.     On approximately September 22, 2023, KIM texted Co-Conspirator-1 in Korean what translates to "Please give $10,000 to the Korean members first."  Co-Conspirator-1 replied to KIM with a list of names.  Medicaid claims data confirms that the names Co-Conspirator-1 sent to KIM are Medicaid recipients for whom Happy Life billed Medicaid for purportedly providing SADC services.

44.     On approximately August 31, 2022, LEE texted Co-Conspirator-1 in Korean what translates to "I gave the payment for [member name].  I left the envelope for [member name] with Tony [KIM]."  In response, Co-Conspirator-1 texted in Korean what translates to "Yes, I gave it."

45.     LEE frequently texted with Co-Conspirator-1 in Korean information about specific Medicaid recipients and their enrollment with SADCs or home care.   For example, on approximately September 23, 2025, LEE texted Co-Conspirator-1 in Korean an individual's name, date of birth, Medicaid number, phone number, and a message that translates to "Requesting 7 days with Healthfirst."

F.      Financial Records

46.     KIM was a signatory on a bank account ending in 9272 held in the name of Pharmacy-1 (the "Pharmacy-1 Account") at Financial Institution-1, an entity whose identity is known to me.   Records for the Pharmacy-1 Account show that KIM signed checks to multiple supermarkets, consistent with obtaining supermarket gift certificates that Co-Conspiator-1 has explained were used for the payment of illegal kickbacks and bribes.   KIM also signed cash withdrawal slips, consistent with obtaining cash for the payment of illegal kickbacks and bribes. In approximately 2021, KIM transferred control of the Pharmacy-1 Account to Cooperating Witness-1, who then wrote checks to supermarkets and to trading companies at KIM's direction to obtain supermarket gift certificates and cash, respectively, to be used for paying illegal kickbacks and bribes.

47.     LEE is the sole signatory on a bank account at Financial Institution-2, an entity whose identity is known to me, ending in 1983 (the "LEE Account").   Between approximately February 2024 and June 2025, the LEE Account received approximately $763,399.80 from bank accounts held in the name of Happy Life.   This represents approximately 73% of deposits in the LEE Account.

48.     Several of the deposits in the LEE Account from Happy Life appear inconsistent with ordinary payroll activity based on amounts and the pattern of the transactions.

15

For example, on approximately July 8, 2024, September 10, 2024, and December 4, 2024, LEE received wires for approximately $100,000 from Happy Life, and on approximately January 7, 2025, LEE deposited approximately $100,000 from Happy Life. These deposits and wires were in addition to and comingled with what appear to be payroll deposits. In total, between approximately February 2024 and June 2025, LEE received more than approximately $685,000 in apparent non-payroll deposits/transfers from Happy Life.

49. LEE has used a significant portion of those deposits for gambling. Between approximately February 2024 and June 2025, LEE withdrew from the LEE Account approximately $124,208 at a casino in Yonkers, New York. LEE also withdrew significant funds totaling approximately more than $341,000 in transactions that exceeded $1,000. For example, on approximately December 6, 2024, LEE withdrew approximately $120,000 from the LEE Account.

50. Happy Life has maintained business bank accounts at a series of banks over the last several years. Several banks have closed Happy Life's bank accounts due to suspicious activity. A review of Happy Life's business bank accounts during the relevant period demonstrates that Happy Life was paid by MLTC-1 for purportedly providing SADC services.

51. KIM profited significantly from the scheme. For example, in approximately August and September 2024 alone, KIM transferred to himself approximately $200,000 from a Happy Life bank account ending in 8896 at Financial Institution-2 in approximately four transactions.

G.    Announcements at Happy Life

52. In approximately January 2026, Cooperating Witness-1 reported to law enforcement that LEE had identified Cooperating Witness-1, whose cooperation is not public, as

16

a government informant and informed Happy Life members that he believed that to be fact. Since that time, Cooperating Witness-1 has been told by several mutual patients shared by Happy Life and Pharmacy-1 that LEE forbade all Happy Life members from using Pharmacy-1 to fill prescriptions and threatened to stop paying them kickbacks for their enrollment at Happy Life if they continued to use Pharmacy-1.

53. Individual-1, who delivers prescription drugs dispensed by Pharmacy-1 to Happy Life members at Happy Life, reported to law enforcement that in approximately December 2025 or January 2026, LEE announced to Happy Life members, in sum and substance, that they should bring their prescription drugs to Happy Life so they can be "put to good use." Individual-1 also reported to law enforcement that, within the last several months, LEE announced that he had kicked two members out of Happy Life for discussing with members of other SADCs how much Happy Life paid them.

54. Based on the foregoing, there is probable cause to arrest the defendants INWOO KIM and DANIEL LEE for conspiring to commit health care fraud contrary to Title 18, United States Code, Section 1349.

IV.    Request for Sealing

55. I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the instant application and arrest warrants. The investigation is not known to the targets, who are currently at liberty, and it is respectfully submitted that sealing these documents is necessary to prevent the targets from learning that an arrest warrants have been issued, and to thus prevent the targets from

fleeing prosecution, destroying or tampering with evidence, notifying confederates, or otherwise seriously jeopardizing the investigation.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued so that the defendants INWOO KIM and DANIEL LEE, may be dealt with according to law.

*Jillian Husman*
JILLIAN HUSMAN
Special Agent, HHS-OIG

Sworn to before me telephonically this
 5th  day of February, 2026

*Marcia M. Henry*
THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK